## DARIUS D. BUFFUM *v.* EDWARD HARRIS.

Engineers, who have taken the comparative levels of a fountain of water and of certain agricultural drains laid in the same lot of land in which the fountain is situated, and have examined the character of the subsoil intervening between them, are, as experts, competent to testify to their opinion that the drains do not lessen the quantity of water in, or injuriously affect the fountain, giving the facts upon which their opinion is founded; a well-digger, who from the exercise of his business in the vicinity of such fountain and drains has become acquainted with the character and qualities in that respect of the intervening subsoil is, for the same reason, competent to testify to his opinion whether a given thickness of such intervening subsoil, if undisturbed, is impervious to water; a farmer and a gardener, who have attended to and practised the draining of lands for the purpose of making them productive, are competent, as experts, to testify to their opinion whether a certain piece of land, examined by and known to them, requires to be drained to fit it for cropping; knowledge of any kind, gained for and in the course of one's occupation or business as pertaining thereto, being precisely that which entitles one to be considered an expert, so as to render his opinion founded on such knowledge, admissible in evidence.

A grant of "a certain spring or fountain of water"—the fountain being found by the jury to be fed by a spring which issued from beneath a rock at the bottom of the fountain, which grant contemplates that the land on which the fountain is situated is to be used for agricultural purposes, does not deprive the owner of the land of the right of properly draining his land to make it productive, even though in some unknown mode the drainage of the land may affect the supply of water to the fountain. Water, which has fallen upon land in rain or has flowed or overflowed into land from springs, ponds, swamps, wells or reservoirs, and has intermingled therewith, following no definite channel, belongs absolutely to the owner of the land, to be disposed of at his pleasure,—and may be drained off and diverted by him in such mode and direction as suits his convenience, notwithstanding the effect of such draining and diversion is to lessen the supply of water to some mill stream or reservoir of another.

ACTION ON THE CASE, to recover damages of the defendant for defiling, draining, and stopping the passage of water from a certain fountain of the plaintiff's, situated on the land of the defendant, and tumbling down the walls of said fountain; and for obstructing and hindering the plaintiff and his servants in the use of said fountain, and in going to, and returning from, said fountain and the pipes leading therefrom, with their necessary teams, carts, and implements, for the purpose of examining and repairing said fountain and pipes; whereby the plaintiff and his tenants, and others to whom he had sold supplies of water from said fountain, were, to his damage, annoyed in the use of the same.

At the trial of this case before the chief justice, with a jury,

at the September term of this court, 1857, under the general issue, it appeared that the plaintiff, by deed of Smith Arnold, a former owner of the land of the defendant, dated May 6, 1835, was the grantee of a certain fountain and rights appurtenant, situated in an orchard lot belonging to the defendant, and not far from his house in Cumberland. The words of said grant to the plaintiff, descriptive of the subject and extent of it, were as follows :—

" A certain spring or fountain of water, situated in said Cumberland, on the Benjamin Arnold farm, (so called,) westerly of the old house spot on said farm, and over which fountain there is a building now standing; also, the privilege of deepening the reservoir of said fountain beneath said building, and of making such other improvements on the land of this grantor about said fountain as may be necessary for the full use and benefit of the water thereof in the manner hereinafter provided; also, the house now standing over said fountain, together with the benefit of all the improvements now made around said fountain; also, the privilege of conveying the waters of said fountain through the land of this grantor to the foot of the hill southerly from said fountain at the line of land of Waldo Earle, about twenty rods, together with the pipe now laid in said land for the purpose of conveying said water; also, the privilege of entering upon the land of said Smith Arnold to view said fountain and the improvements and appurtenances thereof, and the pipe above mentioned, and to make repairs upon the same at all times; provided, always, that the said Darius D. Buffum shall do no unnecessary injury to the said land, or the crops which may be growing thereon; and shall always, and at all times, level or carry away the earth which he may dig out, and fill holes which for any of the purposes of improving said spring he may dig; and remove the stones and rocks which he may dig out, so as to leave said land in as good order as may be, and with as little injury by reason of said improvements as may be, for the purposes of husbandry." "And I, the said Smith Arnold, having sold to the said Buffum the aforesaid fountain to convey the waters thereof into the village of Woonsocket Falls, for the supply of such inhabitants of said village as may live easterly of,

or on the Cumberland side of, the Blackstone River, and included within the limits of School District No. 1, of said Cumberland, as now bounded, do hereby covenant as aforesaid, that if the waters of said fountain shall, upon trial, be found sufficient to supply the wants of the inhabitants within the aforesaid limits, then, so long as the same are sufficient for that purpose, I will neither convey nor conduct myself, nor sell to be conveyed or conducted by any person to that part of the village of Woonsocket Falls indicated above, the waters of any other fountain on land which I now own; still, however, retaining the right, in case the waters of the aforesaid fountain shall at any time hereafter be found insufficient to supply the inhabitants of said village within the limits aforesaid, to sell the waters of any other fountain which I now own, to be conveyed as aforesaid; provided, always, that the said Darius D. Buffum, his heirs and assigns, who may at such times hereafter own the fountain hereinbefore conveyed, shall, for such other fountain or fountains have, what is called, the first offer; i. e., shall have the privilege of buying the same upon paying therefor as much as any other person. And furthermore, the said Smith Arnold, having granted and conveyed the aforesaid fountain and privileges to the said Darius D. Buffum, to enable him to convey the waters of said fountain into the said village of Woonsocket Falls for the supply of the inhabitants within the limits aforesaid, it is throughout expressly understood, and for the better understanding of the true intent and meaning hereof, it is expressed, that whenever the said Buffum, his heirs and assigns, shall discontinue the use of said waters for the purposes aforesaid, then the same shall revert to me or my legal representatives."

Much evidence was offered and received on the part of the plaintiff, tending to prove, that certain drains laid by the defendant in various directions in the fountain lot, ostensibly for the purpose of preparing thereby the top soil for cultivation, in fact, by their proximity to the fountain, their comparative levels with it, and the character of the intervening soil, had the effect of draining off the waters from the fountain, as well as of preventing water from flowing into it; and the former effect was

21*

especially attributed to what was called "the short drain"— being the drain nearest to, and below, on the hill-side, the fountain.

The defendant, to rebut the imputation that his drains in the fountain lot were designed expressly to affect the plaintiff's fountain, offered the testimony of Ansel Holman, a farmer, and scythe maker, who swore that he was the owner of a farm of an hundred acres; and had attended for twenty-seven years to agriculture, and to the subject of drainage for agricultural purposes; and that, he had from curiosity and at the request of the defendant examined the land of the defendant in the neighborhood of the plaintiff's fountain, to see what could be done for it, and had advised him, some four or five years ago and several times since, that to get crops from it it was necessary to drain it; that in fact the soil was very wet, so that without draining, the defendant could not get his crops in so early as others by some weeks; which testimony, as well as that of William Sturgeon, another witness offered by the defendant, and who swore to the same effect, and that he had been a gardener by profession for some twenty years, and in Scotland as well as in this country, had had a good deal of experience in draining, and had, as a gardener, advised the defendant, and superintended the laying of the drains in question, was, notwithstanding the objection of the counsel for the plaintiff, suffered to pass to the jury. The defendant also, in order to prove that his drains, from the comparative levels of the bottoms of them with the levels of the bottom and top of the plaintiff's fountain, and the clayey nature of the subsoil of the fountain lot, rendering the earth intervening between the drains and the fountain impervious to water, did not injuriously affect the fountain of the plaintiff, offered the testimony of Niles B. Schubarth— the engineer appointed by the court as the surveyor in the case; also, of Samuel B. Cushing, another engineer, who had examined the drains and fountain and the relative levels of the same, and who swore that his business had made him acquainted with the percolation of water through different soils; also, of Ebenezer Rose, an experienced well-digger in the vicinity of the plaintiff's fountain, who swore that in the course of his business

in that neighborhood, he was acquainted with the character of the subsoil and its imperviousness to water—all of whom, the engineer appointed in the case after stating the relative levels of the fountain and drains and their proximity to each other, swore, also, that in their opinion, considering the character of the soil as they knew it, if the soil was not broken up, and the distances of the drains from the fountain were as given by the engineer of the case, the drains of the plaintiff, including "the short drain," could not drain off the water from the plaintiff's fountain; which testimony, notwithstanding the objection of the counsel for the plaintiff, was suffered by the judge presiding at the trial to pass to the jury.

The engineer and other witnesses in the cause having testified that the fountain was fed by a spring issuing from under a rock in the bottom of the fountain, the judge who tried the cause, in summing up, told the jury, in substance, "that in construing the grant of the fountain in question to the plaintiff (referring to the above grant of Smith Arnold to the plaintiff) they were bound to consider the character of the subject of the grant, described in it as a spring and fountain of water with the right of deepening and improving it; and that, if they found from the evidence that this was a fountain not supplied by surface water, but from a spring from beneath, issuing from under a rock in the bottom of the fountain, they were also bound to construe the grant as not excluding the owner of the land from the right of surface drainage,—an agricultural right of great importance, in the eye of the law, from its policy, that for want of it, land should not be condemned to sterility ; that this right of surface drainage might indeed be parted with by the owner of the soil by express words or by necessary implication, but without these, would not be presumed to be parted with ; and that, if the jury found, that the fountain granted was one fed by a spring issuing from under and through the subsoil, the surface drainage of the defendant, even though it did prevent the surface water, or the water from other springs than that which fed the plaintiff's fountain, from passing through the top soil into it, or did drain off the water passing from the fountain into the top soil without fault of the defendant, yet that such

surface drainage did not derogate from the plaintiff's grant, and gave no right of action to him therefor against the defendant; but that, if the defendant had purposely or negligently constructed his drains, so as thereby to drain the water off from, or to lessen the quantity of water in the plaintiff's fountain, he would be liable to the plaintiff therefor."

Under these instructions, a verdict having been returned for the defendant, the plaintiff now moved for a new trial, on the double ground, that the court had suffered the opinion of witnesses, not experts, to pass to the jury, both as to the nature of the subsoil in the fountain lot, with reference to its being impervious or not to water, and also with regard to the necessity of surface drainage to fit the top soil of the same lot for cultivation; and had also misdirected the jury as to the construction of the plaintiff's grant.

*Wm. H. Potter,* for the motion, insisted upon the above grounds for it, and contended, that by virtue of the above grant to the plaintiff by the defendant's predecessor in title to the fountain lot, the plaintiff had, as incident to the granted right of improving the fountain, a right to the use of the water of all the springs upon the lot; and that inasmuch as it could not be known how the plaintiff's fountain was fed, whether from the surface water coming from other springs or from below the drains of the defendant, if the drains lessened the water in the plaintiff's fountain, they were in derogation of his grant; and the jury should have been so instructed.

*Robinson,* against the motion. The testimony of Schubarth was rightly admitted, even if he were not an expert, because he states the facts upon which the opinion was founded. *Culver* v. *Hasler,* 7 Barb. 314; *Dewitt* v. *Bailey,* 13 Ib. 550. But Schubarth was an expert. He was the engineer selected by the plaintiff, assented to by the defendant, and appointed by the court to make a survey of the premises, fountain, drains, &c.; was selected for his competency, and as such engineer it was perfectly proper for him to give his opinion. *Davis* v. *Mason,* 4 Pick. 156. And the evidence of Schubarth was certainly competent, for the testimony went to the very matter in controversy, viz: " the draining of the foun-

tain." The testimony of Cushing was admissible for the rea-
sons given above—and more particularly, as his most important
testimony was in answer to the cross-examination of plaintiff's
counsel. The testimony of Holman was properly admitted, be-
cause he was proved to be an expert upon the subject of drain-
ing and agriculture ; and it was also competent, to show that
the defendant did not maliciously, and with intent to injure the
plaintiff, construct said drains, if for no other purpose, to meet
the question of damages; and particularly, as the court charged
the jury, that if defendant had purposely constructed his drains
so as thereby to drain off the water from or lessen the quantity
of water in plaintiff's fountain, the defendant would be liable
therefor—and the testimony of Holman was properly admitted
to meet this point. Sturgeon's testimony was admissible, be-
cause he was a gardener by profession, acquainted with drain-
ing, and testifying to important facts, showing the absolute
necessity of draining these lands for agricultural purposes, and
repelling all idea of intentional injury by defendant to plain-
tiff. *Vandine* v. *Burpee,* 13 Met. 288. Rose's testimony was
admissible, because he was proved to be an expert ; and
although he had not seen the drains, he knew the character
of the soil, and it was competent for him to give his opinion
as to the effect of the drains upon the fountain ; their distance,
dimensions, and relative situation to the fountain being given.
1 Greenl. § 440, p. 489, and cases there cited.

The charge of the court, that in construing the grant of
the fountain to the plaintiff, they were bound to consider the
subject of the grant, was sound law ; and has been recog-
nized as such, ever since courts have been called upon to
give a construction to deeds. *Reed* v. *Proprietors of Locks
and Canals,* 8 How. 374; *Adams* v. *Frothingham,* 3 Mass. 352 ;
*Duncklee* v. *Milton Railroad Company,* 4 Foster, (N. H.) 489,
and cases there cited.

Besides, the grant of the spring was made reserving the right
of husbandry. But if these rights were not reserved in terms,
surface drainage could not affect the fountain, because the jury
found, and the testimony proved, that the spring issued below
the subsoil.

The right to improve his own land for agricultural purposes, was a right incident to the defendant as the owner of the soil; the right not having been parted with by express terms, nor by implication ; *Acton* v. *Blundell,* 12 Mees. & Welsb. 324; *Arkwright* v. *Gell,* Gale & Whately on Easements, 126 ; 5 Mees. & Welsb. 203 ; *Williams* v. *Gale,* 3 Harr. & Johns. (Md.) 231 ; *Greenleaf* v. *Francis,* 18 Pick. 117 ; *Roath* v. *Driscoll,* 20 Conn. 533 ; *Wood* v. *Waud,* 3 Excheq. R. 746; *Greatrex* v. *Hayward,* 20 Eng. L. & Eq. R. 377; *Broadbent* v. *Ramsbotham,* 34 Ib. 553 ; *Rawstron* v. *Taylor,* 33 Ib. 436 ; *Ellis* v. *Duncan,* 21 Barb. 234 ; *Wheatly* v. *Baugh,* 1 Casey, 528 ; and if water escaped from the fountain into the top soil of defendant's land, or any portion of it, he had a right to relieve himself of it by drains; for the dominant owner could impose no additional burden upon the servient tenement. Gale & Whately on Easements, 234.

AMES, C. J. The allowing of the opinions of the two engineers, who, as witnesses for the defendant, swore, that his drains did not injuriously affect the fountain of the plaintiff, to pass to the jury, coupled with the facts upon which they founded them, affords no ground for a new trial of this case. One of the engineers was appointed by the court for the purpose of examining into and reporting upon this very subject; and founded as the opinions of both were upon the relative levels of the drains and fountain, and the nature of the intervening soil, known to both of them, it would be difficult to imagine who would be experts upon such a subject, if they were not. Their business, in superintending the construction of mill-dams and other guards against the flow of water, as sworn to by one of them, makes them practically acquainted with the relative capacity of our different common soils to resist the percolation of water; and that, too, without claiming for them any high degree of scientific attainment with regard to the nature of soils or the laws which regulate the flow or action of water.

The same remark applies to the admission of the well-digger's opinion to pass to the jury, to the effect, that two feet of the subsoil intervening between the fountain and "the short drain," if left undisturbed,—the subsoil being such as his business exer-

cised in that neighborhood informed him that it was,—was sufficient to dam the former against the latter.

The farmer, and the gardener, too, although the farmer joined the business of scythe-making to farming, both of whom swore that they had attended to and practised the draining of lands for the purpose of making them cultivable, were surely competent, as experts, to testify to their opinion that the land of the plaintiff required draining to fit it for cultivation, and to the fact that for that reason they had advised it; the purpose of the testimony being, to meet the imputation cast upon the defendant, that he had laid his drains in the fountain lot, for the sole purpose of diverting, and of draining water, from the fountain of the plaintiff. Indeed, knowledge of any kind, gained for and in the course of one's business as pertaining thereto, is precisely that which entitles one to be considered an expert, so as to render his opinion, founded on such knowledge, admissible in evidence.

We are at a loss, too, to see wherein the judge who presided at the jury trial in this case erred, to the injury of the plaintiff, in directing the jury in regard to the construction of the plaintiff's grant from Smith Arnold. The grant was of " a certain spring or fountain of water," situated on a piece of land, the title to which has since become vested in the defendant. It was made, as the grant itself expressly says, for the sole purpose of enabling the plaintiff to supply the inhabitants of a certain school district in Cumberland, lying within the limits of the village of Woonsocket Falls, with water, for family and other use; and the spring or fountain, when no longer applied by the plaintiff to that use, was, by the terms of the grant, to revert to the grantor. The fountain was supplied, as the evidence tended to prove, by the spring; and that issued from beneath a rock at the bottom of the fountain. This fountain and spring, with the building over it, and the privilege of deepening the reservoir of the fountain under the building, with right of making improvements on the land of the grantor about the fountain, so that the grantee might have, in the afterwards specified manner, the full use and benefit *of the water of the fountain,* and of laying and repairing pipes to conduct the water of the fountain through the land of the

grantor towards the village of Woonsocket, together with the ancillary right of visiting and examining both fountain and pipes for the purpose of repairs, constitute the entire subject of the grant. We know not what the counsel for the plaintiff means by his suggestion, that, under the grant, the plaintiff has the right of leading the water from any other springs on this land to his fountain, for the purpose of improving the same; when the grant itself expressly refers to another fountain or other fountains on the land of the grantor, possible or existing, (which of course must be fed by springs,) the waters of which the grantor expressly retained the right to convey or to sell, for the use of the inhabitants of the very school district which the granted fountain was designed to supply with water, if the supply from the granted fountain should prove to be insufficient for their wants; the grantee, in such case, to have merely the first offer of such other fountain or fountains if the grantor should choose to sell them.

Now, in construing such a grant, as he was bound to do, with reference to the character of the subject of it, the judge surely did not misdirect the jury when he told them in substance, that if they found from the evidence, that the subject of the grant was a fountain fed by a spring issuing from beneath a rock at the bottom of the fountain, they were bound to construe the grant as not excluding the owner of the land from the right of surface drainage, whether the surface water, which had fallen as rain, or came from other springs, flowed through the top soil, down the hill, towards the fountain, or, without the fault of the defendant, from the fountain, into the top soil below it. The surface water is certainly not included in the grant of a fountain which is fed by a spring at the bottom of it; but so far from being included, when the grant was designed, as this was, for the sole purpose of supplying the people of a village with pure water, is, by necessary implication, excluded from the grant, as it would be excluded by a sensible grantee, by every means, from his fountain. It may, without doubt, by express terms or necessary implication, be granted; but both of these are wanting in this grant to convey it. On the contrary, the implication here is quite the other way; inasmuch, as the grant

guards against an interference by the grantee with the husbandry of the fountain lot, through an improper or negligent exercise of his granted rights in it. It indicates, in other words, that it was understood by the parties, that the land in which the fountain was situated, was, notwithstanding the grant, to be used by the grantee for agricultural purposes; and if so, the right of surface drainage, as well as every other agricultural right, would be presumed to be retained, unless plainly at war with the terms or operation of the grant. The right to change the level or direction of an agricultural drain, as the cases cited in the brief of the counsel for the defendant show, is not lost from a presumed grant to another of the right to use the water flowing therefrom, proved by his use of the water for twenty years and upwards; and can, with as little propriety, be presumed to be parted with by an express grant which does not necessarily include it. The water, whether it has fallen as rain, or has come from the overflow of a pond or swamp, which sinks into the top soil and struggles through it, following no defined channel, is deemed by the law absolutely to belong to the owner of the land upon which it is found, for the avowed purpose of enabling him to cultivate his land by controlling or draining it off in the mode most convenient to him; and is not affected by any right in the owner of an adjoining river, pond, or tank, which it may chance for the time to feed, though that time be ever so long protracted. It is not water in a watercourse, or in an infinitesimal number of minute watercourses, in the sense of being obedient to the law regulating the use of water flowing in such defined natural channels; but is, in the eye of the law, as well as of common sense, the moisture, and a part of the soil with which it intermingles, to be there used by the owner of the soil, if to his advantage, or to be got rid of in any mode he pleases, if to his detriment. The language of Baron Alderson, in delivering the judgment of the court of exchequer in the recent case of *Broadbent* v. *Ramsbotham*, 34 Eng. L. & Eq. R. 562, 563, brought by a mill-owner to recover damages against a land-owner for diverting water " coming to his mill-stream, called Longwood Brook, from four sources of water upon the defendant's land, to wit: a pond, a swamp, and two wells," is

quite apposite to express what we deem to be the settled law upon this subject.

" Now, we think that this water," (the water of the pond,) " both that which overflows and that which sinks into the land, belongs absolutely to the defendant, upon whose land it arises, and is not affected by any right of the plaintiff at all. The right to the natural flow of the water of Longwood Brook undoubtedly belongs to the plaintiff; but this right cannot extend further than the right to that which flows into the brook itself, and the waters flowing into a natural channel, either subterranean or otherwise, or over the surface communicating directly with the brook itself. No doubt, all the water falling from the heavens, and then upon the surface of the hill, at the foot of which the brook runs, must, by the force of natural gravity, find its way into the bottom, and so into the brook; but this does not prevent the owner of the land on which the water falls, from dealing with it as he pleases, and appropriating it to his own purposes. He cannot, it is true, do so, if the water has once arrived at and is flowing into some natural channel already formed; but he has a perfect right to appropriate the water before it arrives at such a channel. In this case, the basin is formed upon his own land, and the water belongs to him, and the water from heaven lodges there. There is here no watercourse at all. If this water exceeds a certain depth and escapes upon the land, and squanders itself, so to speak, over the adjoining surface, the owner of the soil has clearly a right to drain this shallow pond, and get rid of the inconvenience at his own pleasure.

" The same may be said of the swamp of sixteen perches, which is merely like a spring, so to speak, fixed in the side of the hill. If this overflows, it creates a sort of marsh adjoining, and there is properly no course of water either into or on the surface of the water. As to the subterranean courses communicating with this swamp, which must exist, it is sufficient to say, that they are not traceable so as to show the water, passing along them, ever reaching Longwood Brook. This falls, therefore, within the same category, or rather is a stronger instance of the rule before mentioned."

The same doctrine is then applied by him to the diversion by

the defendant of the overflow of two wells upon his land, before the water had reached any defined natural channel, conveying it onwards to Longwood Brook.

It will be noticed, that the objection raised by the counsel of the plaintiff to the right of the defendant to drain his land, as laid down by the presiding judge in this case, to wit, that thereby the surface-water, which by some secret channels or sluices feeds the fountain or spring of the plaintiff, may be diverted, though none such are known, is directly met and disposed of by the court in the above case.

In fine, we see no error in the instructions given to the jury upon this point of the case, and think, that in application to the evidence in it, the plaintiff received the benefit of all the direction in his favor to which he was entitled, when the jury were told, " that if the defendant had purposely or negligently constructed his drains, so as thereby to drain the water off from, or to lessen the quantity of water in, the plaintiff's fountain, he would be liable to the plaintiff therefor."

The motion for a new trial in this case is therefore denied, with costs.